IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


DAVID B. CASE                                                          PLAINTIFF


    v.                            CIVIL NO. 2:16-CR-2256

NANCY A. BERRYHILL, [1] Acting Commissioner,
Social Security Administration                        DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, David B. Case, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

### I.    Procedural Background:

Plaintiff protectively filed his current application for DIB on November 5, 2013, alleging an inability to work since April 1, 2013,[2] due to back and hip pain, alcoholism, and issues from a previous injury to his right leg. (Tr. 63, 73). For DIB purposes, Plaintiff maintained insured status through December 31, 2017. (Tr. 63, 73). An administrative hearing was held on July 20, 2015, at which Plaintiff appeared with counsel and testified. (Tr. 31-51).

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2] Plaintiff originally provided that his alleged onset date was July 1, 2004, but subsequently amended the alleged onset date to April 1, 2013. (Doc. 9, p. 1; Tr. 242).

Jim B. Spragins, Vocational Expert (VE), and James Phillip Posey, Plaintiff's friend, also testified. (Tr. 52-61).

In a written opinion dated September 24, 2015, the ALJ found that the Plaintiff had the following severe impairments: lower limb fracture and degenerative disc disease. (Tr. 13). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 13-14). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b), except that Plaintiff may occasionally climb, balance, crawl, kneel, stoop and crouch. (Tr. 14-17). With the help of VE testimony, the ALJ determined that Plaintiff was unable to perform his past relevant work as a lumber stacker, a cutoff saw operator, a saw operator-trim, or a trimmer saw operator. (Tr. 17-18). However, based on the Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff was capable of work as a fast food worker, a cashier II, and a price marker. (Tr. 19). Ultimately, the ALJ concluded that the Plaintiff had not been under a disability within the meaning of the Social Security Act from April 1, 2013, through the date of the decision. (Tr. 19).

Subsequently, on October 24, 2015, Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 7). His request was denied on August 31, 2016. (Tr. 1-6). Plaintiff filed a Petition for Judicial Review of the matter on November 1, 2016. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 9, 10).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

**II.    Evidence Submitted:**

At the hearing before the ALJ on July 20, 2015, Plaintiff testified that he was born in 1965 and had a high school education. (Tr. 32). Plaintiff's past relevant work consists of work as a lumber stacker, a cutoff saw operator, a saw operator-trim, and a trimmer saw operator. (Tr. 56).

Prior to the relevant time period, Plaintiff was involved in a motorcycle accident and sustained a femur fracture in his right leg. (Tr. 374-376). As a result, Plaintiff underwent a right femur irrigation and debridement with intramedullary rodding. (Tr. 273-275).

Medical evidence during the relevant time period reflects that on November 12, 2013, Dr. Clifford Evans performed a General Physical Examination, wherein he noted Plaintiff's complaints from his 2004 motorcycle accident and his subsequent surgery for the fracture to his femur. (Tr. 284). Dr. Evans also noted Plaintiff's complaints of lower back pain, a right shoulder injury, and hip pain. (Tr. 284). Dr. Evans' exam revealed normal extremities and spine, no muscle spasm, negative straight leg raise, no muscle weakness or atrophy, no sensory abnormalities, and normal limb function. (Tr. 286-287).

On December 26, 2013, non-examining medical consultant, Dr. Robert Redd completed a Physical RFC Assessment, where he determined that Plaintiff was capable of light work. (Tr. 69). On February 28, 2014, Dr. Jim Takach, also a non-examining medical consultant, completed a Physical RFC Assessment upon reconsideration, where he affirmed Dr. Redd's assessment and determined that Plaintiff was capable of light work. (Tr. 79).

3

On January 24, 2015, Plaintiff presented at the Mercy Hospital Emergency Room with complaints of an injury to his lower right leg after falling into a hole. (Tr. 297). Imaging of Plaintiff's right leg revealed a distal tibia and fibula metaphyseal fracture with some lateral displacement, distal fragments, and soft tissue swelling. (Tr. 293). Plaintiff's physical examination showed enema and tenderness in the musculoskeletal area; an obvious deformity to the right tibia, fibula, and ankle; ecchymosis and discoloration; and decreased range of motion due to pain. (Tr. 301). A splint was placed on Plaintiff's leg for stabilization. (Tr. 304). Plaintiff was given pain and nausea medication and instructed to use crutches, to avoid weight-bearing activity, to ice and elevate as much as possible, and to follow up with Dr. Stephen Heim, an orthopaedic surgery specialist. (Tr. 298-299). Emergency room records also indicated that Plaintiff reported that he had been smoking and using smokeless tobacco. (Tr. 301).

On January 27, 2015, Plaintiff underwent a pre-operative examination and blood work. (Tr. 324-326). Clinic notes from Cooper Clinic, where Plaintiff saw Dr. Jeffrey Evans, indicated that Plaintiff elected to proceed with surgery for his displaced right distal tibia and fibula fracture. (Tr. 342).

On January 30, 2015, Plaintiff underwent an open reduction internal fixation for the right distal and fibula fracture. (Tr. 344). Dr. Evans' notes indicate Plaintiff tolerated the procedure well and that there were no complications. (Tr. 347). Plaintiff was discharged the same day with instructions to ice, elevate, and keep the surgical dressing dry. (Tr. 351). Clinic notes indicate Plaintiff was using smokeless tobacco and that he refused outpatient counseling for tobacco cessation. (Tr. 352).

On February 2, 2015, Plaintiff saw Dr. Evans for a follow up appointment after surgery. (Tr. 431). Dr. Evans' notes indicate Plaintiff was "doing better," his wounds were healing nicely, and his swelling had decreased. (Tr. 431). Plaintiff's second follow up appointment with Dr. Evans was on February 13, 2015, where Dr. Evans' notes also show that Plaintiff was "doing better," his wounds were healing nicely, his sutures were removed, his staples were intact, his swelling had decreased, and his ecchymosis was resolving. (Tr. 428). He was ordered to refrain from any weight-bearing activity on his right leg. (Tr. 428).

At Plaintiff's third follow up appointment with Dr. Evans on February 20, 2015, clinic notes indicate Plaintiff was "doing well," wounds were healing, staples were discontinued, and distal neurovascular exam was normal. (Tr. 425).

On March 17, 2015, Plaintiff had a six-week post-operative check up with Dr. Evans. Dr. Evans' notes indicate Plaintiff was "doing well;" had normal gait; had normal inspection of bilateral ankles, had full range of motion in bilateral ankles; had a normal stability exam at bilateral ankles; and had normal motor coordination, sensation and cardio at bilateral lower extremities. (Tr. 422). Plaintiff's x-ray showed healed fractures with hardware in place and intact. (Tr. 422). Plaintiff was instructed to place weight on the leg as tolerated, to perform range of motion exercises, and to discontinue his surgical boot. (Tr. 422). X-rays also showed good alignment at the fracture site. (Tr. 436).

On April 29, 2015, Plaintiff presented at the Good Samaritan Clinic with complaints of numbness in his fingers at night, and right knee, hip and back pain. (Tr. 442). A physical exam performed by Dr. Leslie Ziegler revealed chronic swelling in the right lower extremity, crepitus in the right knee, and decreased range of motion in his right hip and knee. (Tr. 442).

He was assessed with symptoms suggestive of ulnar neuropathy and right knee and hip pain.
(Tr. 442). It was recommended that Plaintiff sleep with a makeshift splint to prevent the arm
from bending more than ninety degrees during asleep. (Tr. 442). Clinic notes reveal that
Plaintiff was not taking any medication at the time of the visit, and Dr. Ziegler suggested a trial
of Mobic, a nonsteroidal anti-inflammatory drug. (Tr. 442).

Plaintiff returned to the Good Samaritan Clinic on May 27, 2015, with complaints of
continued pain. (Tr. 441). Clinic notes reveal that Plaintiff was not using Tylenol and was not
improving on Percocet. (Tr. 441). Clinic notes also reveal that Plaintiff was using smokeless
tobacco. (Tr. 441). Plaintiff was assessed with chronic knee and hip pain, related to his 2004
motorcycle accident, and ulnar neuropathy. (Tr. 441). Clinic notes also reveal that Plaintiff was
not splinting his arm at night as he was instructed to do. (Tr. 441).

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported
by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th
Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable
mind would find it adequate to support the Commissioner's decision. The ALJ's decision must
be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314
F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that
supports the Commissioner's decision, the Court may not reverse it simply because substantial
evidence exists in the record that would have supported a contrary outcome, or because the
Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th
Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent

6

positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520.

**IV.    Discussion:**

Plaintiff makes the following arguments on appeal: 1) the ALJ erred in failing to fully develop the record, 2) the ALJ erred in determining Plaintiff's severe impairments; and 3) the ALJ erred in his RFC determination, as it was not supported by the examining and treating medical source, documentary evidence, or the hearing testimony.  (Doc. 9, pp. 1-2).

**A.    Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2017. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of April 1, 2013, his amended alleged onset date of disability, through September 24, 2015, the date of the ALJ's opinion.

In order for Plaintiff to qualify for DIB he must prove that, on or before the expiration of his insured status, he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death.  Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that the parties must focus their attention on claimant's condition at the time she last met insured status requirements).

**B.    Failure to Fully Develop the Record:**

Plaintiff alleges that the ALJ failed to fully and fairly develop the record in that: 1) the record did not contain an RFC assessment from a treating physician; 2) the ALJ did not request

a Medical Source Statement of Ability to Perform Work-Related Activities from the consultative examiner and failed to request an updated physical consultative examination after the second leg injury; and 3) the ALJ should have granted Plaintiff's request for a mental consultative evaluation with WAIS/WRAT testing. (Doc. 10, pp. 3-8).

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. Whitman v. Colvin, 762 F.3d 701, 707 (8th Cir. 2014) (quoting Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994)). The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Specifically, an ALJ is not required to order a physical consultative evaluation; he "simply has the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989). Here, the record consists of physical RFC assessments completed by non-examining medical consultants, hospital records from 2004 and 2015, a 2013 General Physical Examination performed by Dr. Clifford Evans, records from Cooper Clinic for post-surgery follow up, clinic notes from the Good Samaritan Clinic, a function report completed by Plaintiff, and hearing

9

testimony.  A review of that medical evidence showed that Plaintiff's motorcycle accident occurred in 2004, well before the relevant time period. (Tr. 259, 261, 262, 263, 264, 271, 273, 275).  The record shows no doctor visits between 2004 and 2013, when Dr. Clifford Evans performed a consultative examination.  In addition, the records show no additional doctor visits until 2015, when Plaintiff fell and fractured his ankle. (Tr. 293-439).   After surgery, Plaintiff had four post-operative visits with orthopedic surgeon, Dr. Jeffrey Evans.  At the last visit in March of 2015, Dr. Evans' notes reveal that Plaintiff was "doing well;" he had normal gait; he had full range of motion in bilateral ankles; his x-rays showed healed fractures; he had a normal stability exam of both ankles;  he had normal motor coordination, sensation, and cardio of both lower extremities; he was ordered to discontinue his surgical boot; he was instructed to perform weight-bearing activities as tolerated; and he was encouraged to exercise.  (Tr. 422-436). Plaintiff's x-ray showed good alignment at the fracture sites.  (Tr. 436).   In April and May of 2015, Plaintiff presented at the Good Samaritan Clinic for complaints of numbness in fingers, right knee pain, back pain, right knee pain, right him issues, and issues from his injury to his right leg. (Tr. 441-442). Plaintiff was treated conservatively for ulnar neuropathy. (Tr. 441-442).  Based on the medical evidence as a whole, the Court finds that the medical sources contained sufficient evidence for the ALJ to make a determination, and thus, there was no error on the part of the ALJ in not ordering additional consultative examinations.

As for Plaintiff's assertion that the ALJ erred in failing to obtain an RFC assessment from a treating physician or a Medical Source Statement of Ability to Perform Work-Related Activities, this argument is without merit.  It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. Pearsall v.

Massanari, 274 F.3d 1211, 1217–18 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)).  The Court finds that there was substantial evidence in the medical record from which the ALJ could make an RFC determination, including a General Physical Examination, medical records, and physical RFC assessments completed by non-examining medical consultants wherein both non-examining medical consultants concluded that Plaintiff was capable of light work.  (Tr. 69, 79, 284-288).  Moreover, Plaintiff's Function Report revealed that he had no problems with personal care, prepared his own meals daily, could walk 100 feet before needing to rest, could drive a car, could shop in stores for food, and could finish what he started. (Tr. 173-182).  Thus, the Court finds there was sufficient evidence upon which the ALJ could make an RFC determination, and in this case, the ALJ was not required to further develop the record.

As for Plaintiff's argument that the ALJ failed to order a mental consultative evaluation with WAIS/WRAT testing, the Court notes that Plaintiff did not allege any mental impairment in his application. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (stating that the fact that Plaintiff did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed).  "The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [Plaintiff's] mental capabilities disfavors a finding of disability.  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) ("[The claimant] worked with his impairments over a period of years without any worsening of his condition. Thus, he cannot claim them as disabling.")).

The Court acknowledges, however, that there was testimony provided at the hearing regarding Plaintiff's literacy status.  Specifically, Plaintiff testified that he had trouble reading

11

and writing and provided the following details at the hearing: that he completed high school in fourteen rather than twelve years, repeating both the first and eighth grades; that he was assessed with a speech impediment at a very young age; that he performed better at math than reading; that his sister would complete paperwork for him; that his mother read his driver's test to him and paid his bills; that his brother assisted him in filling out his application; that his neighbor would assist him with correspondence from his attorney; and that he had assistance when writing a check. (Tr. 32-46). However, testimony also showed that Plaintiff was able to maintain various jobs for many years, including work as a car stripper, as a utility worker, as a handyman, as a welder, and a sawmill worker. (Tr. 32, 38-42). Further, Plaintiff admitted in his Function Report that he could pay bills, count change, handle a savings account, and use a checkbook or money order; he could finish what he started; he could follow written and spoken instructions well; and he got along well with others. (Tr. 178-181). This evidence undermines Plaintiff's claim that his mental impairments prevented him from working. See Roberts, at 469. Thus, the Court finds that the ALJ was not obligated to order psychological testing as to Plaintiff's literacy status. See Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008) (finding that the ALJ fully and fairly developed the record despite the plaintiff's enrollment in special education classes where the plaintiff held semi-skilled jobs for many years; got along well with people; and could count money, follow directions, and focus on the task at hand).

After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period. Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

12

### C.    Plaintiff's Impairments:

Plaintiff argues that the ALJ erred at Step Two by failing to find that Plaintiff's second leg injury, where he fractured his tibia and fibula bones, and his abnormally shortened leg, which was the result of his first leg injury where he fractured his femur bone, were both medically determinable and met severity.  At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c). While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard."  Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

While the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 404.1545(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 404.1523(c) (ALJ must "consider the combined effect of all [the claimant's]

impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").

Based on a review of the record, the Court finds the ALJ did not error in setting forth Plaintiff's severe impairments during the relevant time period.

### D.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. In addressing Plaintiff's credibility, the ALJ noted Plaintiff's Function Report, wherein he stated that while his leg injury caused him to have trouble walking and he had chronic back and knee pain, he had no trouble caring for his personal needs, preparing simple meals, mowing the lawn for several hours, driving, shopping for one hour, and fishing two or three times a month. (Tr. 176-179). Plaintiff also reported that walking was his primary method of travel; that he could go out alone; that he could pay bills; that he could count change; that he could handle a savings account; that he could he could use a checkbook; that he could follow written and spoken

instructions well; that his sleep was not impacted by his conditions; that he took no medication but he drank beer to help with pain; and that he did not use any ambulatory devices. (Tr. 173, 176, 181, 182).

Plaintiff testified at the hearing on July 20, 2015, that he had trouble with swelling in his right leg, requiring him to elevate it several times per day, and that he was no longer able to mow the yard or go fishing. (Tr. 47-51). Plaintiff's long-time family friend, James Phillip Posey, also testified that Plaintiff lived in a trailer on Mr. Posey's land and that while Plaintiff "could not do much," he did not need assistance with cooking, cleaning, housework, or yardwork. (Tr. 53). Mr. Posey said that Plaintiff did "not complain much," but that he sometimes had pain in his leg. (Tr. 53). He stated that Plaintiff was "up and down since surgery." (Tr. 55). Mr. Posey stated that while he encouraged Plaintiff to go to the doctor, Plaintiff refused to seek medical care. (Tr. 54).

With respect to Plaintiff's limb fractures, the record demonstrates that Plaintiff had four post-surgery consultations with Dr. Evans. (Tr. 422, 425, 428, 431, 436). At each of the four visits, Dr. Evans' notes reflect that Plaintiff continued to improve. (Tr. 422, 425, 428, 431). As noted above, at the final visit, Dr. Evans' opined that Plaintiff's gait was normal; he had full range of motion in bilateral ankles; his x-rays showed healed fractures; he had a normal stability exam of both ankles; he had normal motor coordination, sensation, and cardio of both lower extremities; he was ordered to discontinue his surgical boot; he was instructed to perform weight-bearing activities as tolerated; he was encouraged to exercise; he was given a final prescription of Percocet; and a final x-ray showed good alignment at the fracture site. (Tr. 422-436). Moreover, Plaintiff received minimal, conservative treatment for his degenerative disc disease. Impairments that can be controlled with treatment or medication are not

15

disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling).

Although it is clear that Plaintiff suffers some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### E.    ALJ's RFC Determination and Weight of Physicians' Testimony

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform light work, with the exception that Plaintiff may occasionally climb, balance, crawl, kneel, stoop, and crouch, the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of the non-examining medical providers.  In making the RFC determination, the

16

ALJ specifically addressed the right femur fracture that Plaintiff sustained in a 2004 motorcycle accident. (Tr. 16). Hospital records from 2004 indicated that Plaintiff underwent a right femur irrigation and debridement and intramedullary rodding. (Tr. 16, 271). Plaintiff was also diagnosed with right femur fracture delayed union. (Tr. 16, 262). Lastly, in 2004, Plaintiff underwent further bone grafting and bone stimulator implantation. (Tr. 16, 259). There were no further medical records provided until the 2013 General Physical Examination completed by Dr. Clifford Evans. (Tr. 16, 284-288). Following his examination, Dr. Evans diagnosed Plaintiff with degenerative joint disease of the right knee and hip, fracture of the right femur with intramedullary rodding, and chronic lumbar spine strain. (Tr. 16, 288). Dr. Evans opined that Plaintiff had mild to moderate restriction to the body as a whole. (Tr. 16, 288). The ALJ assigned great weight to Dr. Evans' assessment, as it was consistent with the medical evidence. Based on the testimony of Plaintiff and the Vocational Expert, the ALJ noted that although Plaintiff sustained a right femur fracture in 2004, he continued to perform medium to heavy work. (Tr. 16).

The ALJ further addressed the January 2015 tibia and fibula fracture that Plaintiff sustained when he fell into a hole. Hospital records indicate that Plaintiff was diagnosed with tibia and fibula right closed fracture; that a splint was placed on his leg for stabilization; and that he was instructed to use crutches, to avoid weight-bearing activity, to take medication as prescribed, and to ice and elevate the leg as much as possible. (Tr. 299). Later that month, Plaintiff underwent an open reduction internal fixation right distal tibia and fibula fracture. (Tr. 16, 344). Hospital records show that Plaintiff tolerated the procedure well and that there were no complications. (Tr. 16, 347). Plaintiff was discharged the same day and instructed to ice and elevate the leg and keep the dressing dry. (Tr. 351). In March of 2015, after several

17

post-operative follow up visits, Dr. Jeffrey Evans noted that Plaintiff was improving and doing well.  (Tr. 17, 422, 425, 428, 431).  At Plaintiff's six-week follow up with Dr. Evans, his examination showed that the bilateral ankles had normal range of motion, normal motor coordination and sensation, and normal gait.  (Tr. 17, 422).  Plaintiff's x-ray showed that his fractures were healed with intact hardware and good alignment.  (Tr. 17, 436).  Dr. Evans prescribed one last refill of Percocet, and he instructed Plaintiff to discontinue the fracture boot, to engage in weight-bearing activity as tolerated, and to exercise.  (Tr. 17, 422).

The ALJ also considered the two visits Plaintiff made to the Good Samaritan Clinic where was treated for his continued hip and knee pain and numbness in his fingers.  (Tr. 17, 441-442).  Plaintiff's knee and hip pain was treated with medication, and he instructed him to splint his arm at night to help his symptoms of ulnar neuropathy.  (Tr. 17, 441).

Furthermore, the ALJ considered the opinions of the non-examining medical consultants, Drs. Robert Redd and Jim Takach, who reviewed the medical record and found that Plaintiff was capable of light work with no limitations.  (Tr. 17, 69, 79).  The ALJ gave these opinions great weight as the medical evidence showed that Plaintiff's fractures had healed; that there was a lack of ongoing, aggressive therapy; and that Dr. Evans' physical examination showed normal extremities, normal spine, no muscle spasms, negative straight leg raise bilaterally, no muscle weakness, no atrophy, no sensory abnormalities, and normal limb function.  (Tr. 286-287).

As previously noted, Plaintiff sought very little treatment for his back pain, and when treated, it was with conservative measures.  Further, the medical evidence showed that Plaintiff did not seek further treatment for his 2004 leg injury, and his testimony showed that he worked

18

for many years following that injury. Medical evidence also showed that his 2015 fractures were healed with good alignment. Plaintiff's reported activities of daily living also support the ALJ's determination that he could perform light work. Specifically, Plaintiff reported that he could manage his own personal care; could prepare simple meals; could mow the lawn; could drive; could shop for one hour; could go out alone; could pay bills; could count change; could handle a savings account; could he could use a checkbook; and could follow written and spoken instructions well. (Tr. 173, 176-179, 181, 182). He further reported that his sleep was not interrupted by his conditions, that he did not take any medication, and that he did not use any ambulatory devices. (Tr. 173, 176-179, 181, 182).

Upon careful review of the record, the Court finds that there was substantial evidence to support the ALJ's RFC determination of light work, with the exception that Plaintiff may occasionally climb, balance, crawl, kneel, stoop, and crouch.

### F.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the Vocational Expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a fast food worker, a cashier II, and a price marker. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

19

## V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 16th day of January, 2018.


/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE